# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MOUNTAIN CREST SRL, LLC<br>1208 14th Ave,<br>Monroe, Wisconsin,<br><br>*Plaintiff,*<br><br>vs.<br><br>ANHEUSER-BUSCH InBEV SA/NV<br>Brouwerijplein, 1<br>3000 Leuven<br>Belgium,<br><br>and<br><br>MOLSON COORS BREWING COMPANY<br>1801 California Street, Suite 4600,<br>Denver, Colorado<br><br>*Defendants.* | Case No. 17-cv-595<br><br>COMPLAINT FOR VIOLATION OF ANTITRUST LAWS<br><br>**DEMAND FOR JURY TRIAL** |

*Attorney for Plaintiff,*
Charles Benoit
Bar ID No. 1000244
1629 K St. NW, Ste 300
Washington, DC 20006
Tel: (202) 734-0939
charles.benoit@cebenoit.com

## TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................................3

II.    JURISDICTION, VENUE, AND COMMERCE.......................................................................4

III.   PARTIES .....................................................................................................................6

    A.  Plaintiff ...............................................................................................................6

    B.  The Defendants ....................................................................................................8

IV.    AGENTS AND CO-CONSPIRATORS ..............................................................................9

V.     FACTS ........................................................................................................................9

    A.  The Cross Border Beer Trade ...............................................................................9

    B.  The Defendants' Jointly Owned and Managed Distribution and Retail Business .........................11

    C.  Defendant's Secret Agreement to Limit Competition .............................................14

    D.  Plaintiff's experience in Defendants' TBS .............................................................19

VI.    VIOLATIONS ALLEGED ..............................................................................................20

    A.  The Secret Agreement's Blatant, Per Se Illegal Restraints on Trade.............................20

VII.   CAUSES OF ACTION ..................................................................................................22

    A.  COUNT 1 – SHERMAN ACT § 1: CONSPIRACY IN RESTRAINT OF TRADE ....................22

    B.  COUNT 2 – SHERMAN ACT § 2: MONOPOLIZING TRADE .........................................23

    C.  COUNT 3 – UNJUST ENRICHMENT........................................................................23

VIII.  PRAYER FOR RELIEF .................................................................................................24

IX.    DEMAND FOR JURY TRIAL.........................................................................................25

## COMPLAINT

### I.      INTRODUCTION

1.      This antitrust action is brought against Defendants Anheuser-Busch InBev SA/NV ("ABI") and Molson Coors Brewing Company ("Molson Coors"), the largest and second largest brewers respectively in both the United States and Canada, for their conspiracies restraining Plaintiff's export trade to the Province of Ontario, Canada.

2.      Section 1 of the Sherman Act declares that every contract, combination, or conspiracy in restraint of trade or commerce with foreign nations is declared to be illegal. And yet over the course of many years, the two Defendants entered into a series of agreements with each other, detailed in this complaint, which had the intended and direct effect of restricting the ability of those not part of their conspiracy, including and especially the Plaintiff, from competing for packaged beer exports to Ontario.

3.      The most flagrant of these restraints on trade came to light on December 9th, 2014, when the *Toronto Star* published a leaked copy of a secret anticompetitive market allocation agreement ("Secret Agreement")[1].

4.      The Secret Agreement's sole function was to limit competition in beer sales and to monopolize sales for the benefits of Defendants. The Secret Agreement, signed by an executive of Molson Coors on behalf of a business jointly and exclusively controlled by Defendants, stipulated that the Defendants' only retail competitor in Ontario "will not sell

---

[1] The full text of the Secret Agreement is accessible on the *Toronto Star* website at https://www.thestar.com/news/queenspark/2014/12/09/the_beer_stores_secret_sweetheart_deal_with_lcbo_revealed _cohn.html

beer … in packages containing more than 6 containers and will not promote beer at price points greater than 6 containers."[2]

5.      The direct, substantial, and foreseeable effect from Defendants' market allocation and price fixing actions was to monopolize for themselves beer sales, thus causing Plaintiff and other similarly situated American domestic competitor breweries lost export sales and significantly harming Plaintiff's ability to compete in the value beer segment.[3]

6.      The Secret Agreement is but one of the *per se* illegal horizontal agreements Defendants orchestrated to monopolize competition in beer in Ontario – North America's fifth largest sub-national jurisdiction, behind only California, New York, Florida, and Texas.

7.      Plaintiff seeks actual, consequential and exemplary damages as well as declaratory and injunctive relief from Defendants' knowing fraud that garnered it illicit profits from anticompetitive conduct throughout the period the Secret Agreement was in force.

## II.      JURISDICTION, VENUE, AND COMMERCE

8.      Plaintiff bring this action under Sections 4, 12 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 22 and 26, to recover treble damages and costs of suit, including reasonable attorney's fees, and for permanent injunctive relief in accordance with Section 16 of the Clayton Act, 15 U.S.C. § 26, against Defendants for the injuries inflicted on Plaintiff by Defendants' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

---

[2] "A Framework for Improved Co-Operation & Planning Between the LCBO and BRI", June 1st, 2000, page 3
[3] See *Lotes Co., Ltd. v. Hon Hai Precision Industry Co.*, 753 F.3d 395, 398 (2d Cir. 2014) "foreign anticompetitive conduct can have a statutorily required "direct, substantial, and reasonably foreseeable effect" on U.S. domestic or import commerce even if the effect does not follow as an immediate consequence of the defendant's conduct, so long as there is a reasonably proximate causal nexus between the conduct and the effect.", adopting interpretation advocated by amici curiae the United States of America and the Federal Trade Commission and adopted by the Seventh Circuit in its en banc decision in *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 856-58 (7th Cir. 2012) (en banc).

9.     This Court has subject matter jurisdiction over the claims asserted in this lawsuit pursuant to 28 U.S.C. § 1331 (Federal question) and §1337 (Commerce and antitrust) and 15 U.S.C. §§ 15(a) and 26. It is well accepted that the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), 15 U. S. C. §6a, authorizes causes of action for American businesses under American anti-trust laws for lost export sales, even if the conspiracy took place in foreign commerce.[4] The United States Supreme Court has held that "While applying America's antitrust laws to foreign conduct can interfere with a foreign nation's ability to regulate its own commercial affairs, courts have long held such application nonetheless reasonable, and hence consistent with prescriptive comity principles, insofar as the laws reflect a legislative effort to redress domestic antitrust injury caused by foreign anticompetitive conduct."[5]

10.    The 7th Circuit has reinforced that businesses are liable under the FTAIA for conduct that takes place entirely outside of the United States if the conduct had a foreseeable effect on U.S. exports. "[T]he requirements of the FTAIA go to the merits of an antitrust claim rather than to subject matter jurisdiction."[6]

11.    Plaintiff have standing to bring this claim per the test articulated by the United States Supreme Court in *Associated General Contractors of California, Inv. v. California State Council of Carpenters*, 459 U.S. 519, 535 (1983): (1) Plaintiff's injury is precisely the sort that the antitrust laws were intended to forestall; namely, two dominant businesses using their market power to stifle competition; (2) Plaintiff's injury was direct, causing lost export trade

---

[4] *F. Hoffman-LaRoche, Ltd. v. Empagran SA*, 542 U.S. 155, 158 (2004) ("The Foreign Trade Antitrust Improvements Act of 1982 (FTAIA) provides that the Sherman Act "shall not apply to conduct involving trade or commerce … with foreign nations, but creates exceptions for conduct that significantly harms imports, domestic commerce, **or American exporters")** [emphasis added].
[5] *Id.* at 165
[6] *Lotes Co., Ltd. v. Hon Hai Precision Industry Co.*, 753 F.3d 395, 405 (2d Cir. 2014) and *Minn-Chem, Inc. v. Agrium Inc.*, 683 F. 3d 845, 852 (7th Cir. 2012)

for Plaintiff's Wisconsin beer; and (3) Plaintiff's harm and injury to its sales, payroll, and growth in Monroe, Wisconsin is real and quantifiable.

12.     Venue is proper in this judicial district under 15 U.S.C. § 22 because this is an action under the antitrust laws against corporations in a district where Plaintiff resides and where Defendants transact business.[7] ABI and Molson Coors produce and sell beer in the flow of interstate and foreign commerce and their production and sale of beer substantially affect interstate and foreign commerce.

13.     Defendants' conduct was within the flow of, was intended to, and did, in fact, have a direct effect on the export commerce and export trade of brewers in the United States.

## III.     PARTIES

### A.  Plaintiff

14.     Plaintiff Mountain Crest SRL, LLC, owns and operates the Minhas Craft Brewery in Monroe, Wisconsin, which is also Plaintiff's principal place of business and operations.

15.     According to the Brewers Association, the Minhas Craft Brewery in Monroe is the 21st largest brewery in America, and the 12th largest independently owned brewery.[8]

16.     The brewery was started in 1865, and since then has had several name changes, but has remained family owned since its founding. The brewery is the Midwest's oldest brewery and the second oldest in the entire nation.

17.     In 2003, the brewery started brewing beers for Ravinder Minhas, a Canadian entrepreneur, under the Mountain Crest line of value beer labels and other value brands. These beers were brewed for export to Alberta, Canada on a contract basis. Mr. Minhas also invested

---

[7] See *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1350-51 (D.C. Cir. 2000)
[8] Press Release, "Brewers Association Releases Top 50 Breweries of 2016", March 15, 2017, available at https://www.brewersassociation.org/press-releases/brewers-association-releases-top-50-breweries-of-2016/

in additional can packaging equipment for the Monroe brewery to expand the Mountain Crest line and other brands. This new arrangement increased the production of the brewery by five times.

18.     By 2005, the beer exported to Alberta made up 85% of the brewery's total production. The brewery's export trade to Alberta was vital in keeping it alive and working. On October 3rd, 2006, following the initial success, the Minhas Family purchased a 100% interest in the brewery.

19.     Plaintiff's strategic goal for the enterprise since inception has been to compete with the major brewers in the low-cost value end of the beer market. This goal was to be executed by building on Plaintiff's early success in exports to western Canada, proceeding with expansion eastward across the country.

20.     Plaintiff is a U.S. domestic competitor to Defendants.

21.     Plaintiff has been exporting its Wisconsin-brewed Boxer brand beer to Ontario, Canada, since November, 2009 on a continuous basis, however growth in this critical market has not matched Boxer beer's export growth to other markets.

22.     Logistics for export sales are handled by Plaintiff's office in Rhinelander, Wisconsin. All beer Plaintiff has ever sold to Ontario was brewed and packaged in Wisconsin and exported directly from Wisconsin to Ontario as finished product.

23.     Plaintiff's ability to compete with Defendants in the value-beer segment is entirely dependent on achieving economies of scale through high volume production, distribution, and sales. Many parts of Plaintiff's brewery layout and design are 30-40 years old and in need of investment to compete effectively with Defendants in the North American value beer segment.

24.     Building on the success of its export trade to Western Canada, Plaintiff counted on the Ontario market as the next logical step to becoming a premier competitor in the high volume North American value beer segment.

25.     Plaintiff cannot be said to have suffered injuries in Ontario because it has no presence there, other than individuals hired to act as sales representatives.

### B.  The Defendants

26.     The U.S. and Canadian brewing industry is dominated by Defendants, who according to their own numbers have a roughly three-quarter market share of U.S. and Canadian beer sales.

27.     ABI is a corporation organized and existing under the laws of Belgium, with its headquarters in Leuven, Belgium. ABI organizes its global business into nine geographic zones, with the "North America" zone management responsible for the United States and Canada.[9] ABI is the world's largest brewer and has a 45% U.S. market share and a 43.1% Canadian market share. Of its dozens of major beer brands, ABI designates three of its brands as "Global Brands": Budweiser, Corona, and Stella Artois. In the United States, ABI brews Budweiser and Stella Artois domestically, and imports Corona. In Canada, ABI brews all three of its Global Brands in Canada, rather than import them.

28.     Molson Coors is a business incorporated and existing under the laws of the State of Delaware, with dual principal places of business listed on its annual 10-K in both Denver, Colorado, and Montreal, Quebec. Molson Coors maintains an extensive portfolio of brands, including core brands Carling, Coors Light, Miller Lite, and Molson Canadian, as well as specialty brands such as Blue Moon and Creemore Springs. Molson Coors has a roughly 28%

---

[9] Anheuser-Busch InBev, *Our Markets*, http://www.ab-inbev.com/our-story/our-markets.html (last visited June 1, 2017).

U.S. market share and a 34% Canadian market share.[10] The Molson family trust and the Coors family trust together control more than 90% of the Molson Coors' Class A common stock, and Molson Coors warns shareholders that if the two trusts do not agree on certain actions, generally the matter will not be approved, even if beneficial to Molson Coors Brewing Company or favored by other stockholders or a majority of Molson Coors Board of Directors.[11]

## IV.     AGENTS AND CO-CONSPIRATORS

29.     Individuals and/or entities unknown to Plaintiff at this time participated as co-conspirators and performed overt acts in furtherance of the conspiracy through the period the Secret Agreement was in force. Whenever reference is made to any act, deed, or transaction of any entity, the allegation means the entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parent, controlling shareholder trust, predecessors, or successors-in-interest while they were engaged in the management, direction, control, or transaction of business or affairs of the entity.

## V.     FACTS

### A.  The Cross Border Beer Trade

30.     Beer is a relevant product market and line of commerce under the Clayton Act. Beer is usually made fermenting a cereal grain, flavored with hops. Beer's taste, alcohol content, image, price, and other factors make it substantially different from other beverage alcohol products. Other beverage alcohol products, such as wine and spirits, are not sufficiently suitable substitutes to consumers.

---

[10] Molson Coors 2016 10-K, Management Discussion and Analysis, , pg. 10
[11] Molson Coors 2016 10-K, Risks Specific to our Company, pg. 25

31.     Beer sold in the United States and Canada can generally be grouped into three segments: value brands, premium brands, and high-end brands. Value brand beers are priced the lowest of the segments.

32.     Brewers with a broad portfolio of beer brands, especially Defendants, maintain "price gaps" between each beer segment to minimize competition across segments.

33.     The Province of Ontario has 13,983,000 residents, representing 38.5% of the Canadian population. Two-way agri-food trade between Ontario and the United States totaled $28.8 billion CAD in 2016.[12]  Ontario is a natural initial export market for Mid-West U.S. agri-food businesses, especially in near-term perishables like beer, because of its significant population bordering the Great Lake States, extraordinary two-way trade links, and because it falls within a shared U.S. media market.

34.     The Brewers Association – the nonprofit trade organization representing small and independent U.S. craft brewers – states that American craft brewers exported 54,477,189 liters of beer in 2016. [13] Canada represented more than half of total U.S. exports at 54.8%, or 29,853,500 liters of craft beer exported to Canada. Ontario represents approximately 35.5% of Canadian beer market sales.

35.     American brewers, including Plaintiff, wishing to export their beer to Ontario have only two options for distribution and retail within the province: (1) the government owned alcohol retailer, the Liquor Control Board of Ontario ("LCBO"); or (2) a distribution and retail business, Brewers Retail Inc., incorporated in 1927 as a cooperative of Ontario

---

[12] Office of the Premier, "Premier Wynne and Minister Leal Discuss U.S. Trade Relations with Ontario Agri-Food Leaders" May 4, 2017, *available at* https://news.ontario.ca/opo/en/2017/05/premier-wynne-and-minister-leal-discuss-us-trade-relations-with-ontario-agri-food-leaders.html
[13] Press Release, "American Craft Beer Exports at All-Time High - Exceeding $121 Million", Brewers Association, April 4, 2017, *available at* https://www.brewersassociation.org/press-releases/american-craft-beer-exports-all-time-high/ (Note: 465,617 barrels reported, converting at 1 U.S. beer barrel to 117 liters.)

brewers, but by way of acquisitions became entirely controlled by Defendants (more on this below).

36.     The LCBO does not charge listing fees to brewers from whom it purchases. When the LCBO purchases beer from breweries for LCBO stores, it simply pays the brewery a wholesale price and issues purchase orders based on that price.

37.     The LCBO does not deal with resellers. Breweries may appoint a local third-party agent to represent them to the LCBO, but LCBO purchase orders are always issued directly to the beer brand owner, regardless of location.

38.     The LCBO procures beverage alcohol by issuing public tenders.

39.     Beer shelf space in the LCBO is extraordinarily competitive, as the LCBO mostly focuses on wine and spirits. Beer constituted just 22.4% of LCBO sales in the last fiscal year, with the rest being sales of wine and spirits.[14]

40.     ABI and Molson Coors sell their beer through LCBO stores, and command a dominant sales position in the LCBO, with the two brewers' brands accounting for over 70% of beer sales in the LCBO,[15] giving Defendants significant market power over the LCBO.

41.     Plaintiff was able to get a listing for the LCBO as well, but only to sell in single units, which is hardly economically viable.

**B.  The Defendants' Jointly Owned and Managed Distribution and Retail Business**

42.     ABI and Molson Coors jointly own and operate Brewers Retail Inc., which they say is the world's largest beer retailer. This business operates under the trade name "The Beer Store" ("TBS").

---

[14] LCBO QuickFacts, available at http://www.lcbo.com/content/lcbo/en/corporate-pages/about/media-centre/quick-facts.html
[15] Initial Report, Premier's Advisory Council, available at https://www.ontario.ca/page/initial-report-premiers-advisory-council-government-assets

43.     TBS is the LCBO's only competition in off-premise packaged beer sales in Ontario.[16] TBS distributes and retails beer to the public with over 450 locations in Ontario, enjoying a three quarter market share of beer sales in the province. The remaining market share is attributed to sales at LCBO stores.

44.     Combined, Defendants own 98% of the controlling shares in TBS. This share is split evenly among the two Defendants.[17] Sapporo Holdings Limited (Japan) holds the remaining 2%, but it is not being named in this Complaint because according to the company, it "has not and does not dispatch any member of the board of directors of TBS and has not and is not involved in the management of TBS."[18]

45.     In a poll of 2,890 Ontarians conducted on January 28th, 2015, *after* the highly publicized anticompetitive revelations, most Ontarians were still unaware that TBS was controlled by the two Defendants. Rather, they believed TBS to be like the LCBO in that it was government owned: "Forty-five percent thought the Beer Store was owned by the government of Ontario."[19]

46.     TBS "takes in about $2.5-billion [Canadian dollars, "CAD"] in revenue annually after taxes, of which roughly 80 per cent goes to the owners."[20]

47.      Until September 22nd, 2015, the TBS Board consisted of just eight members, with Defendants appointing four each respectively. Following pressure from the Government

---

[16] Other Ontario breweries are able to sell packaged beer solely on the site of their brewery, but these sales are less than 1% of total packaged sales in Ontario and are not relevant for the analysis here.

[17] Adrian Morrow, "The Beer Store: Everything you need to know about Ontario's lucrative monopoly", THE GLOBE AND MAIL, May 3rd, 2015, *available at* https://www.theglobeandmail.com/news/politics/the-beer-store-everything-you-need-to-know-about-ontarios-lucrative-monopoly/article23248112/

[18] Sapporo Holdings Limited, "Notice Concerning the Filing of a Lawsuit against a Consolidated Subsidiary of Sapporo Holdings Limited", February 12, 2015, available at http://www.sapporoholdings.jp/english/news_release/pdf/15021301.pdf

[19] PostMedia News, "Most Ontarians have no idea a group of foreign multinationals own the Beer Store: poll", NATIONAL POST, January 29th, 2015

[20] Adrian Morrow, "The Beer Store: Everything you need to know about Ontario's lucrative monopoly", THE GLOBE AND MAIL, May 3rd, 2015, *available at* https://www.theglobeandmail.com/news/politics/the-beer-store-everything-you-need-to-know-about-ontarios-lucrative-monopoly/article23248112/

of Ontario, the Board was expanded to include independent directors, but TBS remains in the equal control of Defendants. New "shares" issued following the September 22nd, 2015 reforms do not affect Defendants' actual control of TBS.

48.    TBS is not a joint venture like the type in *Texaco Inc. v. Dagher*,[21] which ended competition in its particular market between its corporate parents. Defendants continue to compete with each other in the Ontario market, but only on terms they agree to and impose on others via their jointly owned dominant beer distributor and retailer, TBS.

49.    Defendants have not obtained an Export Trading Company Act ("ETCA") certificate for TBS. Congress created the ETCA specifically to enable U.S. firms to collaborate with each other regarding export markets. The ETCA authorized the Department of Commerce to issue Export Trade Certificates of Review, which provide "substantive federal antitrust protection and procedural benefits to U.S. firms interested in collaborating on export activities."[22]

50.    Defendants charge breweries that are **not** TBS owners an array of fees to have their product available in TBS stores, but have instituted policies at TBS that exempt themselves from paying those same listing fees. The *New York Times* writes that "Getting a product into the Beer Store is also expensive. There's an upfront fee of 2,800 Canadian dollars and then an additional charge of 230 Canadian dollars for each store where the brewer wants to sell."[23] This information is supported by the TBS Rate Sheet effective May 2012.

---

[21] Texaco Inc. v. Dagher, 547 U.S. 1 (2006)
[22] *See* "ECTA Main Page", Department of Commerce – International Trade Administration, *available at* http://trade.gov/mas/ian/etca/index.asp
[23] Ian Austen, "Ontario's Beer Bottleneck Is Under Siege by Brewers and Buyers", N.Y. TIMES, March 6th, 2015, *available at* https://www.nytimes.com/2015/03/07/business/international/ontarios-beer-bottleneck-is-under-siege-by-brewers-and-buyers.html

51.     Defendants say they cover any TBS costs that are not covered by non-owner fees and elected service fees (that owners and non-owners would pay alike), but Defendants ensure that TBS' fees to other brewers cover TBS operating costs.

52.     Defendants have raised TBS fees for other brewers every year, at a rate of approximately six times inflation.

53.     Defendants are willing to take money from any brewer for a nominal TBS listing. TBS marketed itself positively to breweries around the world without disclosing its market allocation agreement, or the fact that Defendant breweries received special privileges which discriminated against non-owner breweries. On TBS' "About The Beer Store" webpage in 2009, TBS advertised itself to brewers as follows:

> "Brewers that wish to sell through The Beer Store can pay a per store listing fee or a single fee for the entire system depending on the number of stores they wish to sell in." [24]

and

> "Brewers also select The Beer Store retail locations that they wish to sell in. Brewers can be in one store, 50 stores or all 440 locations of The Beer Store – it is their choice."[25]

54.     Despite marketing to brewers by promising that they "can be in all 440 locations", Plaintiff learned from first-hand experience that this was a severe misrepresentation.

**C.  Defendant's Secret Agreement to Limit Competition**

55.     On June 1st, 2000, Defendants secretly instituted a deliberate and detailed market allocation framework (the Secret Agreement). Under the terms of this Agreement, TBS imposed the following concession: "LCBO will not sell beer … in packages containing more

---

[24] The Beer Store, "About the Beer Store", February 2009, *available at*
https://web.archive.org/web/20090217234907/http://thebeerstore.ca:80/AboutUs/Corporate.asp
[25] *Id.*

than 6 containers **and** will not promote beer at price points greater than 6 containers." The Secret Agreement was effective from June 1st, 2000, to September 22nd, 2015.

56.     The Secret Agreement had two signatories. The first was Dave Perkins, a Molson Coors executive, signing in his capacity as Chairman of the Board of TBS the restraints on competition.

57.     The second signatory to the Secret Agreement was A.S. Brant, CEO of the LCBO. When asked about the origins of the agreement by the *Toronto Star* in 2014, Mr. Brant made clear that the Secret Agreement originated entirely with Defendants. Mr. Brant told the *Toronto Star* that Defendants were "plainly spooked about the erosion of [TBS'] longtime monopoly position. The LCBO had been stocking more beer in its newly renovated outlets, stealing market share from the shabby stores in the [TBS] chain."[26]

58.     The first element of this restriction, that the LCBO "not sell beer … in packages containing more than 6 containers" ensured that American brewers, including Plaintiff, could not export beer to Ontario in 12 or 24 packs unless they paid to use Defendants' own TBS stores. This horizontal market allocation substantially harmed competition by monopolizing the export trade to the Ontario beer market. Plaintiff was denied the ability to sell beer in economical packages to the LCBO.

59.     The second element of this restriction – "promoting beer at price points greater than 6 containers", refers to what the trade refers to as "Pack-Up Pricing". With Pack-Up Pricing, a consumer can, for example, purchase four individual six-pack cases of beer (for a

---

[26] Martin Regg-Cohn, "The Beer Store's secret sweetheart deal with LCBO revealed" , TORONTO STAR, Dec. 9th, 2014, *available at* https://www.thestar.com/news/queenspark/2014/12/09/the_beer_stores_secret_sweetheart_deal_with_lcbo_revealed _cohn.html

total of 24 bottles of beer) and receive the same discount as if they had purchase a single 24-bottle case of beer.

60.     The Secret Agreement prevented the LCBO from selling beer through Pack-Up Pricing, enabling Defendants to fix prices for the Ontario market and greatly limiting the LCBO's attractiveness as a beer retail destination for value consumers, as well as discouraging sales of Plaintiff's beer at the LCBO. For example, TBS charged Plaintiff a $3.32 fee for every 24-unit case Plaintiff sold into the Ontario market, in addition to other fees.

61.     Other clauses of the Secret Agreement furthered Defendants' anticompetitive aims with TBS: the LCBO was not to sell to restaurants and bars any of the major brands not carried in its regular stores. This discouraged bars and restaurants from purchasing beer at LCBO stores, monopolizing beer sales for an environment where Defendants were in control.

62.     When the Secret Agreement was signed, 177 communities in Ontario had LCBO stores that sold 12-packs and 24-packs of beer. But under the agreement, if a TBS opened in any of those areas, nearby LCBO stores would have to cut back their beer offerings to 6-packs.[27] The LCBO was thus discouraged from opening new stores in areas where the Defendants' might also decide to open a store, a geographic market division, further harming competitive opportunities for Defendants' U.S. brewer competitors. This limited the stores that were available to retail Plaintiff's Boxer Beer single-serve cans which were carried by the LCBO.

63.     Throughout the duration of the Secret Agreement, TBS expanded locations, thus displacing LCBO beer sales, per the Secret Agreement. In April of 2004, TBS boasted on its

---

[27] Riley Sparks, "How the secret deal between the LCBO and Beer Store affects the booze you buy" , TORONTO STAR, Dec. 11th, 2014, *available at* https://www.thestar.com/news/canada/2014/12/11/how_the_secret_deal_between_the_lcbo_and_beer_store_affects_the_booze_you_buy.html

website that "New Beer Stores in former LCBO combination store communities include: Erin, Lambeth, Schomberg, Smithville, Coniston, and Stittsville".[28]

64.     The June 2000 Secret Agreement remained secret until a whistleblower gave a copy to the *Toronto Star*, which published the Agreement on December 9th, 2014. The Agreement was finally terminated on September 22nd, 2015, and replaced with a new "Master Framework Agreement" which instilled reforms on how TBS operates.

65.     While TBS actively marketed itself to U.S. breweries, at no point until the *Toronto Star's* revelation did Defendants either themselves or via TBS disclose the trade restraints they had imposed upon U.S. brewers' only alternative to TBS for export sales, the LCBO.

66.     The Secret Agreement was not entered into with any color of law or government authority. This contrasts with the form taken by its successor agreement, the September 22nd, 2015 agreement, which was backed with legislation, included "Her Majesty the Queen in Right of Ontario" as a signatory, and is available for viewing on the Ontario Ministry of Finance's website.[29] The Secret Agreement contained none of these attributes. The Secret Agreement explicitly stated that any applicable legislation "will, at all times, take precedence over the [agreement]".

67.     Individuals directly employed by Defendants resisted the Ontario government's reform efforts following revelation of the Secret Agreement. Stewart Glendinning, CEO of Molson Coors International and an American lawyer, was asked to defend TBS by the *New York Times*, and responded "I know what's best for consumers. And having seen a wide range

---

[28] The Beer Store, "Retail Renewal", available at
https://web.archive.org/web/20040404121702/http://www.thebeerstore.ca:80/about/tbs-renewal.html
[29] "Master Framework Agreement", Ministry of Finance for Ontario, available at
http://www.fin.gov.on.ca/en/consultations/beer/agreement.html

of retailing across the world, I can tell you that [TBS] is a system that is low-cost and passes that cost along to consumers."[30] Mr. Glendinning also warned against reforms to the Canadian Press, and is quoted as saying that "My overall worry is that we create a problem for beer volumes in Ontario"[31].

68.     Three days following the December 9th, 2014 revelation by the *Toronto Star*, a legal proceeding seeking class status on behalf of Ontario consumers and licensees was commenced against Defendants' individual and respective Canadian subsidiaries, as well as TBS and the LCBO, in Ontario Superior Court over the Secret Agreement (the "Ontario Proceeding"). Plaintiff in that case alleged that TBS "improperly entered into an agreement to fix prices and market allocation within the Ontario beer market". The action sought damages of $1.4 billion CAD.

69.     The government of Ontario subsequently amended the Ontario *Liquor Control Act* effective August 1st, 2015, to insulate the LCBO and TBS from litigation in Ontario court – whether in tort, contract, or Canadian competition law – stemming from the secret deal.[32]

70.     Thanks to their market allocation in the Secret Agreement, Defendants were able to, and did, impose "listing" fees, "handling" fees, and other fees and service charges upon Plaintiff as a necessary cost of business to access the Ontario market. These fees were imposed upon all brewers who sold their beer through TBS, except TBS' owners. These fees have a disproportionately harmful impact on lower-volume brewers attempting access to the Ontario

---

[30] Ian Austen, "Ontario's Beer Bottleneck Is Under Siege by Brewers and Buyers", N.Y. TIMES, March 6th, 2015, *available at* https://www.nytimes.com/2015/03/07/business/international/ontarios-beer-bottleneck-is-under-siege-by-brewers-and-buyers.html
[31] *Id.*
[32] Bill 91, Budget Measures Act, 2015, Schedule 20, , Royal Assent received June 4, 2015, *available at* http://www.ontla.on.ca/web/bills/bills_detail.do?locale=en&BillID=3295, amending the Liquor Control Act, R.S.O. 1990, c. L.18, *See also* Jeff Gray, *Ontario accused of changing law to 'protect' Beer Store*, LCBO, Oct. 26, 2015, *available at* http://www.theglobeandmail.com/report-on-business/industry-news/the-law-page/ontario-accused-of-changing-law-to-protect-beer-store-lcbo/article26995551/

market. The fees charged were imposed per brand, per package size, per each TBS retail outlet. For example, Plaintiff had to pay 12 sets of "handling" and other fees to sell just two brands of beer in a 6-pack and 12-pack format at three TBS stores.

**D.  Plaintiff's experience in Defendants' TBS**

71.     Plaintiff first paid for a TBS listing fee in November, 2009. Plaintiff paid for the full 440 store listing. Plaintiff has to date paid $631,797.09 in TBS listing fees.

72.     TBS stores are austere. The vast majority of stores contain no shelving, but rather simply list inventory on a wall. The stores will have roller conveyer belts; once the customer places their order with the cashier, the beer is then rolled out on the conveyer belt to the customer. This discourages customer shopping and limits competition to brands the customer is already familiar with.

73.     The only product a customer can ever inspect at a TBS store is one of the minority of stores that have a "Grab and Go" cooler where a limited number of single-serving cans of beer are sold. TBS charges Plaintiff for access but the coolers are still almost exclusively filled with Defendants' own beers.

74.     The most significant consumer marketing vehicle in each store, located physically next to the cashier, is the "Big Ten Cooler" or "Big Ten Wall" (if the store does not have a cooler). The "Big Ten" refers to the top 10 selling beer labels at TBS, which all belong to the two Defendants. This strategy, having Defendants' own beer available in a cooler right by the cashier, renders the competitive landscape so tilted against new market entrants that fair competition is all but impossible.

75.     Plaintiff spent close to $1,000,000 in television marketing in the Ontario market in an earnest effort to promote its Boxer Beer upon entering the Ontario.

76.     Shortly after beginning exports, Plaintiff quickly realized how heavily Defendants had rigged competition in Ontario in their favor.

77.     Plaintiff found that despite having paid for a full 440 store listing, that approximately 1 out of 3 TBS stores at any given time were "out of stock" of Plaintiff's beer or certain key package sizes of Plaintiff's beer.

78.     Plaintiff at no point had any shortage of beer to export, and was always timely with listing fees.

79.     Plaintiff put out a press release on February 22nd, 2010, complaining of the out-of-stocking that was being forced on it by TBS. At the time Plaintiff was less aware of the precise mechanisms, but now has a better understanding of how Defendants manipulate competition in TBS stores.

80.     On information and belief, one way Defendants limited availability of competitors' beer in their own stores was by manipulating "par" inventory levels of TBS stores. For example, ahead of key sales periods like long weekends or holidays, Defendants would send entire 53' long trailers of their beer to a particular TBS store, to ensure that every last square foot of inventory space in the TBS would be occupied for that critical sales weekend, and that any particular TBS store manager was unable to stock Plaintiff's beer even if they were so inclined to help. Only after the key sales period would Plaintiff's beer reemerge in the TBS store.

**VI.     VIOLATIONS ALLEGED**

**A.  The Secret Agreement's Blatant, Per Se Illegal Restraints on Trade**

81.     During the first half of the year 2000, Defendants agreed amongst themselves that competition in beer sales with Ontario's government-owned alcohol retailer, the LCBO, was eroding their market share.

82.     Before Defendants would have been in a position to present to the LCBO a market allocation agreement, they would have had to first agree amongst themselves (due to splitting corporate control over TBS) to reserve the market for 12 and 24 pack beer sales for their own store, TBS.

83.     It is believed and therefore alleged that Defendants used their dominant market power vis-à-vis the LCBO, and the considerable marketing expenditures they paid to the LCBO for in-store marketing, to extract from the LCBO the market allocation concessions in the Secret Agreement.

84.     It is believed, and therefore alleged, that for purposes of forming and carrying out their combination and conspiracy, Defendants combined and conspired amongst themselves and through TBS to do, among other things:

  a.  Participating in meetings, conversations, and communications to discuss maintaining their joint subsidiary TBS as the dominant force in beer sales in Ontario vis-à-vis the LCBO;

  b.  Agreeing, during those meetings, conversations, and communications, on requiring the LCBO to not purchase beer in any case size larger than a six-unit container or to allow the LCBO to promote Pack-Up Pricing, resulting in the Secret Agreement and the Secret Agreement's ongoing perpetuation;

  c.  Implementing TBS policies and charging TBS fees in a manner that unreasonably reinforced and stratified Defendant's dominant beer market-share; and

    d.   Engaging in meetings, conversations, and communications elsewhere for the purpose of monitoring and enforcing adherence to the Secret Agreement.

85.    Defendants actively, intentionally, and fraudulently concealed the existence of the combination and conspiracy from the Plaintiff. The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were fraudulently concealed and carried out in a manner that precluded detection. As detailed above, the Defendants took active, deliberate and wrongful steps to conceal their participation in the alleged conspiracy.

## VII.   CAUSES OF ACTION

## A.  COUNT 1 – SHERMAN ACT § 1: CONSPIRACY IN RESTRAINT OF TRADE

86.    Plaintiff re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

87.    Defendants entered into and engaged in a series of conspiracies, including formation of the Secret Agreement to restrain competition for high unit packaged beer sales, by way of their meetings at actions in overseeing TBS, in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

88.    Defendants intended to, and actually did, unreasonably restrain Plaintiff's export sales to Ontario by engaging in a continuing combination and conspiracy that directly and negatively affected growth of Plaintiff's brewery in Monroe. The conspiracy is a *per se* violation of Section 1 of the Sherman Act.

89.    Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of division of markets.

90.    Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of vertical resale price maintenance through TBS, by

developing TBS listing fees which would discriminate against all other brewers, which inherently constituted smaller U.S. breweries exporting to the Ontario market.

91.     Defendants shared a conscious commitment to a common scheme designed to achieve rig the bids through TBS in-store marketing schemes, by developing TBS in-store marketing programs designed to reinforce their existing volumes and market share while limiting the ability of new entrants to compete.

92.     These conspiracies directly, or in the alternative proximately, caused Plaintiff lost export sales to Ontario of its Boxer Brand beer and limited the ability of Plaintiff to introduce other beer products into the Ontario marketplace. There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' market allocations.

93.     Plaintiff is threatened with further injury to its business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Act, 15 U.S.C. § 26.

## B.  COUNT 2 – SHERMAN ACT § 2: MONOPOLIZING TRADE

94.     Plaintiff re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

95.     Defendants entered into and engaged in the conspiracy, the Secret Agreement, to coercively maintain, further and entrench their monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, which had the direct and foreseeable effect of causing lost sales to Plaintiff.

## C.  COUNT 3 – UNJUST ENRICHMENT

96.     Plaintiff re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

97.     Plaintiff conferred benefits on Defendants by paying Defendants fees for the ability to sell beer in Ontario and to sell beer in Ontario in packages greater than six-units and to offer Pack-Up Pricing. Defendants had knowledge that their ability to offer this benefit was due only to their Secret Agreement and accepted and retained the conferred benefit, and under the circumstances it would be inequitable for the defendant to retain the benefit without paying for it.

## VIII.   PRAYER FOR RELIEF

98.     WHEREFORE, Plaintiff respectfully request that:

e.   The Defendants' conspiracy, the Secret Agreement, and acts done in furtherance thereof, be adjudged to have violated Sections 1 and 2 of the Sherman Antitrust Act,  15 U.S.C. § 1 and 2;

f.   That Defendants, in accordance with Section 16 of the Clayton Act, 15 U.S.C. § 26, be permanently enjoined and restrained from continued controlling ownership of TBS; or in the alternative to order that Defendants be required to seek an Export Certificate of Review from the Department of Commerce for their continued operations of TBS;

g.   That Defendants, in accordance with Section 16 of the Clayton Act, 15 U.S.C. § 26, be permanently enjoined from charging a separate set of TBS fees that are not applicable to themselves.

h.   That the Court award damages against Defendants for an amount to be proved at trial in lost export trade to Ontario, to be trebled according to law, plus $200,000 in punitive damages, plus pre-judgment interest, post-judgment interest,

attorney's fees, litigation expenses and costs of suit under Section 4 and 16 of the

Clayton Antitrust Act, 15 U.S.C. § 15 and 26; and

i.   That Plaintiff receives such other, further and different relief as the Court may

deem just and proper.

## IX.   DEMAND FOR JURY TRIAL

99.   Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands

a jury trial as to all issues so triable.

Dated: August 1st, 2017

Respectfully submitted,

By:   _/s/Charles Benoit_

Charles Benoit
Bar ID No. 1000244
1629 K St. NW, Ste. 300
Washington, DC 20006
Tel: (202) 734-0939
charles.benoit@cebenoit.com