IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MOUNTAIN CREST SRL, LLC,

                                Plaintiff,

        v.

ANHEUSER-BUSCH InBEV SA/NV,
individually and as successor to InBev SA/NV and
Interbrew S.A. and MOLSON COORS BREWING
COMPANY, individually and as successor to Molson
Canada Inc.,

                                Defendants.

OPINION & ORDER

17-cv-595-jdp

Plaintiff Mountain Crest SRL, LLC owns and operates Minhas Brewery, which is located in Monroe, Wisconsin. Mountain Crest is suing defendants Anheuser-Busch InBev SA/NV and Molson Coors Brewing Company under both the Sherman Act and Wisconsin common law, alleging that a conspiracy between defendants has hindered its efforts to export its beer to Ontario, Canada. Defendants have moved to dismiss Mountain Crest's second amended complaint on multiple grounds. Dkt. 50.

According to Mountain Crest, defendants' conspiracy has led to limitations on its ability to sell larger quantities of beer at a discount in some Ontario liquor stores. But the conduct Mountain Crest challenges is governed by a contract with the government of Ontario. The agreement was reaffirmed in 2015 and is now authorized by an Ontario statute enacted the same year. Liquor Control Act, R.S.O. 1990, c. L.18, § 10(3) (Can.). Under these circumstances, even if the court assumes that defendants urged the Ontario government to adopt the limitations that Mountain Crest is challenging, defendants' conduct is authorized under the act of state doctrine, which prohibits federal courts from invalidating the public acts

of a foreign government. This conclusion is consistent with a recent decision by an Ontario court, *Hughes v. Liquor Control Board of Ontario*, CV-14-518059CP, 2018 ONSC 1723 (Ont. Sup. Ct. Mar. 15, 2018), concluding that the same conduct alleged in this case did not violate Canadian antitrust law because the conduct was approved by the Ontario government. The court will grant the motion to dismiss Mountain Crest's claims under the Sherman Act and decline to exercise supplemental jurisdiction over the state law claims in accordance with 28 U.S.C. § 1367(c)(3).

REGULATORY BACKGROUND

To help place Mountain Crest's factual allegations and claims in context, it is useful to first provide a brief overview of the relevant regulatory framework. [1] In Ontario, the sale of beer is governed by the Liquor Control Act, which created the Liquor Control Board of Ontario (LCBO) and declared that the LCBO "is for all purposes an agent of Her Majesty and its powers may be exercised only as an agent of Her Majesty." Liquor Control Act, R.S.O. 1990, c. L.18, §§ 2(1) and 4.03(2) (Can.). *See also Hughes*, 2018 ONSC 1723, ¶ 82 (LCBO is "a Crown agency wholly owned by the Government of Ontario").

Among other things, the LCBO has the power "to control the sale, transportation and delivery of liquor," "to establish government stores for the sale of liquor to the public," "to authorize manufacturers of beer and spirits and wineries that manufacture Ontario wine to sell their beer, spirits or Ontario wine in stores owned and operated by the manufacturer or the

---

[1] A federal court may consider a foreign jurisdiction's law under Rule 44.1 of the Federal Rules of Civil Procedure. Both sides discuss various Canadian laws in their briefs and neither side objects to the court's consideration of that law.

winery and to authorize Brewers Retail Inc. to operate stores for the sale of beer to the public," "to determine the nature, form and capacity of all packages to be used for containing liquor to be kept or sold," and "to do all things necessary for the management and operation of the Board in the conduct of its business." Liquor Control Act, R.S.O. 1990, c. L.18, § 3(1) (Can.). Only a government agency may import liquor into Canada. Importation of Intoxicating Liquors Act, R.S.C. 1985, c. I-3, § 3(1) (Can.).

The LCBO has authorized Brewers Retail Inc. (BRI) to sell liquor as a "government store" under the Liquor Control Act. Sale of Liquor in Government Stores, O. Reg. 232/16, § 6 (Can.). *See also Hughes*, 2018 ONSC 1723, ¶ 86 ("Brewers Retail is an established government store and the LCBO determines in what municipalities Brewers Retail may have stores."). BRI is a distribution and retail business that was incorporated in 1927 as a cooperative of Ontario brewers. Dkt. 49, ¶ 44. *See also Hughes*, 2018 ONSC 1723, ¶ 92 ("Brewers Retail was established for the specific purpose of providing Ontario with an efficient and cost-effective channel through which large volumes and packages of beer could be distributed and sold across the province."). BRI does business as "The Beer Store." BRI and the LCBO are the only two options in Ontario for buying beer for consumption off site. *Hughes*, 2018 ONSC 1723, ¶ 91. If an American brewer such as Mountain Crest wishes to export its beer to Ontario, the brewer must go through the LCBO or BRI. BRI has a three-quarter market share of beer sales in the province. Dkt. 49, ¶ 52. *See also Hughes*, 2018 ONSC 1723, ¶ 91 ("Save for the beer sold at the LCBO's Ordinary, Combination, and Agency Stores, Brewers Retail is the distributor, wholesaler, and retailer of beer in Ontario.").

ALLEGATIONS OF FACT

The court draws the following allegations from Mountain Crest's second amended complaint, Dkt. 49, which is the operative pleading.

## A.  The parties

Mountain Crest owns and operates Minhas Brewery in Monroe, Wisconsin, which is Mountain Crest's principal place of business and operations. In 2003, the brewery started brewing for the Canadian "value-beer label" Mountain Crest, and exported the beer to Alberta, Canada on a contract basis. *Id.*, ¶ 17. In 2009, Mountain Crest began exporting beer to Ontario, Canada from Wisconsin. The brewery Mountain Crest operates is currently the 12th largest independently owned brewery in the United States. Mountain Crest's goal is "to compete with the major brewers in the low-cost value end of the beer market." *Id.*, ¶ 19.

Anheuser-Busch InBev SA/NV (ABI) is a corporation organized and existing under the laws of Belgium, with its headquarters in Leuven, Belgium. The Belgian company was previously known as Interbrew SA and later, InBev SA. In 1995, Interbrew SA acquired 100% of Labatt Breweries of Canada. Molson Coors Brewing Company is the result of the combination of Molson Inc. (Canada) into the Adolph Coors Company (Delaware) in February 2005.

ABI and Molson Coors acquired control of BRI by acquiring Labatt Breweries of Canada and Molson Inc. (Canada), the original members of the BRI cooperative. Defendants' subsidiaries each own 49% of BRI. At all relevant times, "defendants" have exclusively shared control. Sleeman Breweries Ltd, the Canadian subsidiary of Japanese brewer Sapporo, is a minority shareholder of BRI.

**B. Events leading up to the June 2000 agreement**

In 1992, Labatt and Molson were both independent Canadian companies that dominated the Ontario beer market and jointly controlled BRI. At that time, BRI sold only beer brewed in Ontario. The LCBO sold both domestic and imported beer, but focused on wine and spirits. *See also Hughes*, 2018 ONSC 1723, ¶¶ 92 and 114 ("The LCBO focused on wine and spirits [because it] did not develop the infrastructure necessary to warehouse, distribute and sell beer on a scale necessary to service Ontario's retail and licencee consumers. . . . In the early 1990's, approximately 95% of all domestic beer sold in Ontario was sold through Brewers Retail.").

During the 1990s and into the 2000s, Labatt and Molson operated an unincorporated trade association that consisted of just the two companies called "Brewers of Ontario," led by Jan H. Westcott, the executive director. Westcott operated as a representative of Labatt and Molson executives and took direction directly from the CEOs of both companies on a regular basis. They used this trade association (as opposed to BRI itself) to negotiate their commercial relationship with the LCBO.

The historical practice of the LCBO was to limit its sale of beer to containers no larger than a six pack, with some exceptions. *See also Hughes*, 2018 ONSC 1723, ¶ 115 (LCBO "followed [that practice] for decades"). In September 1993, the LCBO began considering a change to this practice, noting in a memo that "[n]o legislative or regulatory changes [would be] required." Dkt. 49, ¶ 73. *But see Hughes*, 2018 ONSC 1723, ¶ 157 ("The LCBO would have needed the Provincial Government's approval to change this status quo [regarding the sale 12 packs and 24 packs], and the Government refused to grant any such approval."). The author

of the LCBO memo anticipated opposition from Molson and Labatt because BRI "sales will be diverted to the LCBO." Dkt. 49, ¶ 73.

In July 1994, Molson and Labatt executives met with LCBO executives. Molson and Labatt were "not interested in any widespread sale of 12's and 24's in LCBO stores" because it would give too much access to their U.S.-based competitors with whom they did not have distribution agreements. Dkt. 49, ¶ 75. The LCBO "felt completely at the mercy of Labatt and Molson" because Labatt and Molson already had exclusive distribution agreements with Anheuser-Busch, Miller Brewing, and Coors Brewing. *Id.*, ¶ 77.

In 1995, Interbrew acquired Labatt. Also in 1995, Molson and Labatt representatives agreed to begin supplying the LCBO with 12 and 24 packs for a limited number of LCBO stores. But in December 1998, LCBO corporate staff and Molson and Labatt executives produced a joint "Working Protocol," stating in part that "[t]he LCBO agrees to discontinue its stocking of 12 and 24 SKUs." *Id.*, ¶ 102. LCBO CEO Andy Brandt "felt pressure from Minister [of Consumer and Commercial Relations David] Tsubouchi to concede to demands from Molson and Labatt." *Id.*, ¶ 103. During a January 1999 LCBO board meeting, board members expressed their support for "allowing various package sizes for brewers wishing to sell beer through the LCBO." *Id.*, ¶ 104.

The brewers and the LCBO continued negotiating an agreement related to the LCBO's sales of larger format beer packages. At this time, Molson and Interbrew "were still engaged in their multi-year group boycott, refusing to supply the LCBO with any 6-packs beyond what the LCBO already had, providing any cases of beer larger than a 6-pack, or any beer in cans, to

force the LCBO to comply with their demand that the LCBO not purchase 12s & 24s of beer from any U.S. brewer." *Id.*, ¶ 108.[2]

In April 1999, the LCBO was still pushing for the option of selling eight packs and nine packs, but by May 2000, the LCBO gave up on this idea because it knew that it "could not compel [BRI] to supply it with new brands of beer for sale." *Id.*, ¶ 119.

Minister of Consumer and Commercial Relations Bob Runciman (who succeeded Tsubouchi in June 1999) directed LCBO CEO Brandt to sign the proposed agreement, which would sharply limit the LCBO's sales of large format beer packages. On June 1, 2000, Brandt complied. Dave Perkins of Molson also signed the agreement on behalf of BRI.

Paragraph D of the June 2000 agreement included the following provision: "Consistent with historical practice, LCBO will not sell beer . . . in packages containing more than 6 containers and not promote beer at price points greater than 6 containers." Dkt. 49-19, at 4. The agreement about price points relates to "pack-up pricing," which is offering discounts when multiple six packs are purchased.

The agreement was kept "a closely guarded secret." Dkt. 49, ¶ 128. BRI's minority shareholder, Sleeman Breweries did not know about the agreement at the time it was signed. Ontario municipalities were not aware of the agreement either. They wrote letters to the LCBO asking them to stock 12 packs and 24 packs of beer.

---

[2] In antitrust law, a group boycott is "an agreement to pressure a supplier or customer not to deal with another competitor." *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 318 (S.D.N.Y. 2003). Mountain Crest does not say when the alleged boycott started or how long it lasted.

## C. Events leading up to the 2015 agreement

In the years that followed, the LCBO continued efforts to renegotiate the agreement to allow sales of large format beer packages, but Interbrew and Molson resisted those efforts. For example, in February 2003, the LCBO expressed an interest in offering pack-up pricing and selling 12 and 24 packs at selected stores, but Molson and Labatt refused. And in October 2010, BRI accused the LCBO of violating Section D of the June 2000 agreement by selling beer in packages containing more than six containers.

In August 2004, Interbrew merged with AmBev, a Brazilian-based brewing conglomerate. After the merger, Interbrew changed its named to InBev. AmBev effectively became InBev's Americas division, with Labatt merged into AmBev. In February 2005, Molson Inc. merged with Colorado based Adolph Coors Co. to form the current Molson Coors Brewing Company.

In April 2014, the Premier of Ontario appointed Ed Clark to form a "Premier's Advisory Council on Government Assets," in part to investigate ways to "further monetize" the LCBO. *Id.*, ¶ 184. In November 2014, the council published its initial report, recommending that the LCBO sell 12-packs of beer.

In December 2014, the *Toronto Star* published for the first time a copy of the June 2000 agreement. Three days later, a proposed class action was filed in Ontario Superior Court, *Hughes v. Liquor Control Board of Ontario*, challenging the validity of the agreement on behalf of Ontario consumers, bars, and restaurants.

In January 2015, BRI announced in a press release that its ownership would become "open[] to all Ontario-based brewers." *Id.*, ¶ 194. The announcement was criticized because

"the big three brewers [would] hold 12 seats on a 15-member board of directors, and retain overall control." *Id.*, ¶ 196.

In 2014 and 2015, BRI threatened the government of Ontario with NAFTA expropriation litigation if the government "took steps to undermine their cartel or system of restraints on U.S. exports to Ontario." *Id.*, ¶ 200. These threats "were planned and authorized by [d]efendants['] respective U.S. offices in St. Louis and Denver." *Id.*

On September 22, 2015, the government of Ontario entered into a "master framework agreement" with BRI, Labatt Brewing Company Ltd., Molson Canada 2005, and Sleeman Breweries Ltd. This agreement replaced the June 2000 agreement with the LCBO.

The 2015 agreement includes the following provision: "The Province shall direct the LCBO not to, at any time during the Term: (A) sell Beer in its stores, other than in Combination Stores, in formats larger than Six-Packs (with the exception of the one 8-unit SKU currently carried by LCBO stores that are not Combination Stores) or (B) provide Pack-up Pricing in LCBO stores." The agreement also granted Ontario immunity from suit by BRI and its members.

ANALYSIS

A. **Overview of claims and defenses**

At the heart of this case are two related practices at LCBO stores in Ontario, Canada: (1) not selling beer in a container larger than a six pack; and (2) not allowing "pack-up pricing," which would provide a discount for buying multiple six packs. Mountain Crest objects to these practices for the obvious reason that they inhibit sales of large quantities of beer at LCBO stores.

9

Mountain Crest's theory is that defendants are responsible for both of the LCBO practices at issue. According to Mountain Crest, defendants control the Beer Store, which is the LCBO's only competitor in Ontario for the retail sale of beer. Although the Beer Store is operated by BRI, defendants' Canadian subsidiaries are the major shareholders of BRI and Mountain Crest says that defendants may be held liable for actions taken on BRI's behalf. In order to keep the exclusive right to sell 12 packs and 24 packs of beer at the Beer Store, defendants allegedly limited their supply of beer to LCBO until LCBO agreed to defendants' demands regarding pack size and pack-up pricing. Dkt. 49, ¶ 108. Defendants later threatened to sue the government of Ontario under the North American Free Trade Agreement if LCBO changed its practices. *Id.*, ¶ 200.

Mountain Crest contends that defendants' alleged conduct is a restraint of trade in violation of 15 U.S.C. § 1 of the Sherman Act and an attempt to create a monopoly in violation of 15 U.S.C. § 2. Mountain Crest also contends that defendants were unjustly enriched in violation of Wisconsin law when they charged various fees to Mountain Crest without providing Mountain Crest a corresponding benefit.[3]

Defendants seek dismissal of Mountain Crest's claims under the Sherman Act on multiple grounds: (1) the claims are barred under the act of state doctrine; (2) the claims are barred under the *Noerr-Pennington* doctrine; (3) the Sherman Act does not reach the alleged conduct; (4) comity requires dismissal of the claims; (5) the doctrine of *forum non conveniens*

---

[3] Mountain Crest's second amended complaint is a sprawling 93 pages and includes numerous allegations about what it views as unfair practices by BRI and defendants. For example, Mountain Crest alleges that BRI consistently understocks brands of beer that defendants do not own. Dkt. 49, ¶¶ 100–02, 113, and 173–75. But both sides have assumed in their briefing that Mountain Crest's claims under the Sherman Act are limited to restrictions on selling larger packs of beer and pack-up pricing, so the court has made the same assumption.

requires dismissal of the claims; (6) Mountain Crest has not stated a plausible claim under §1 or § 2; and (7) all of the alleged conduct involves BRI or defendants' Canadian subsidiaries rather than defendants and Mountain Crest has not alleged facts showing that it is appropriate to pierce the corporate veil. Because the court agrees with the first contention, it is not necessary to consider the others.

## B. Act of state doctrine

### 1. Legal standard

The Supreme Court has been applying the act of state doctrine since at least *Underhill v. Hernandez*, in which it described the doctrine as follows:

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

168 U.S. 250, 252 (1897). The "Court's description of the jurisprudential foundation for the act of state doctrine has undergone some evolution over the years," *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 404–05 (1990), but the Court's adherence to the doctrine has not wavered. The Court's most recent articulation of the doctrine is in *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004): "the courts of one state will not question the validity of public acts (acts *jure imperii*) performed by other sovereigns within their own borders, even when such courts have jurisdiction over a controversy in which one of the litigants has standing to challenge those acts." *See also Kirkpatrick*, 493 U.S. at 409–10 ("The act of state doctrine . . . requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid."); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 400–01 (1964) ("The act of state doctrine in its traditional formulation precludes the

courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory.").

Although neither the Supreme Court nor the Court of Appeals for the Seventh Circuit has considered whether the doctrine applies in the context of an antitrust claim, numerous lower courts have said that it does. *E.g.*, *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938 (5th Cir. 2011); *O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*, 830 F.2d 449 (2d Cir. 1987); *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, No. CV162345DMGAGRX, 2016 WL 8648638, at \*4 (C.D. Cal. Aug. 18, 2016); *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1180 (D. Idaho 2011); *In re Refined Petroleum Prod. Antitrust Litig.*, 649 F. Supp. 2d 572 (S.D. Tex. 2009).[4] The parties have not cited any cases to the contrary. And the Supreme Court has rejected antitrust claims under the "state action doctrine," which applies a rule similar to the act of state doctrine in the context of claims against state governments in the United States. *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365 (1991) ("[T]he Sherman Act [does] not apply to anticompetitive restraints imposed by the States as an act of government."). Courts have also consistently held that the sovereign does not have to be a party for the act of state doctrine to apply. *O.N.E. Shipping*, 830 F.2d at 452; *Callejo v. Bancomer, S.A.*, 764 F.2d 1101 (5th Cir.1985); *Int'l Ass'n of Machinists & Aerospace Workers, (IAM) v. Org. of Petroleum Exporting Countries (OPEC)*, 649 F.2d 1354, 1359 (9th Cir. 1981).

---

[4] *American Banana Co. v. United Fruit Co.*, 213 U.S. 347 (1909), is sometimes described as a case in which the Supreme Court applied the act of state doctrine to an antitrust claim. *E.g.*, *Timberlane Lumber Co. v. Bank of Am., N.T. & S.A.*, 549 F.2d 597, 605 (9th Cir. 1976); 1B Areeda & Hovenkamp ¶ 274b, at 385–86 (4th ed.) (stating that *American Banana* applied act of state doctrine to hold that "a seizure by a foreign government of the plaintiff's properties could not support an antitrust claim against the private party who allegedly induced the government to take the action"). But the Supreme Court has rejected that reading. *Kirkpatrick*, 493 U.S. at 407–08 ("*American Banana* was not an act of state case.").

## 2. Application of the doctrine to this case

Under a straightforward application of the act of state doctrine, Mountain Crest's antitrust claims against defendants fail as a matter of law because all of the conduct that allegedly violates the Sherman Act involves a public act by the Ontario government and a ruling in Mountain Crest's favor would require the court to determine that the Ontario government violated the Sherman Act as well.[5] *Kirkpatrick*, 493 U.S. at 406 (act of state doctrine may apply "when a court must decide—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign"). In fact, Mountain Crest's own allegations show that a ruling in Mountain Crest's favor would require this court to question the validity of no fewer than four public acts, all of which were performed in Ontario.

First, in June 2000, the LCBO and BRI entered into an agreement in which the parties agreed that the LCBO would not sell 12 packs and 24 packs of beer or offer pack-up pricing. The practices embodied in that agreement are the same practices that Mountain Crest is challenging as antitrust violations. Because the LCBO is a government agency created by the Liquor Control Act, R.S.O. 1990, c. L.18, §§ 2(1) (Can.), the 2000 agreement is a public act under the act of state doctrine.

Second, the Ontario Minister of Consumer and Commercial Relations directed the LCBO to sign the 2000 agreement. The parties agree that the LCBO was required to follow the direction of the Minister. *Hughes*, 2018 ONSC 1723, ¶¶ 82–83 ("[In 2000], the LCBO . . . reported to the Minister of Consumer and Commercial Relations [, who] was given express

---

[5] Both sides assume that the act of state doctrine applies the same way to a provincial government as to the national government, so the court has made the same assumption.

responsibility for approving all policy decisions that related to changes in the role of the LCBO.").

Third, in 2015, the Ontario legislature enacted an amendment to the Liquor Control Act, which states that the LCBO "is deemed to have been directed, and Brewers Retail Inc. is deemed to have been authorized, to enter into the June 2000 framework in relation to the Crown's or a Crown agent's regulation and control of the sale of beer in Ontario." Liquor Control Act. R.S.O. 1990. c. L.18, § 10(3) (Can.). The parties agree that the "June 2000 framework" is the agreement at issue in this case.

Fourth, also in 2015, BRI entered into a new agreement, this time with the government of Ontario itself. The agreement reaffirmed the same practices that Mountain Crest is challenging in this case. In fact, in the new agreement, the government "direct[s]" the LCBO not to sell "formats larger than Six-Packs" except in limited circumstances and not to provide "Pack-up Pricing in LCBO stores." Dkt. 49, ¶ 207.

Collectively, these acts make it clear that the conduct that allegedly violates the Sherman Act is the official policy of the Ontario government. "[W]hen it is made to appear that the foreign government has acted in a given way on the subject-matter of the litigation, the details of such action or the merit of the result cannot be questioned but must be accepted by our courts as a rule for their decision." *Sabbatino*, 376 U.S. at 418.

There is no way to separate defendants' alleged conduct from Ontario's official acts. Thus, the court agrees with defendants that there is no way to find that they violated the Sherman Act without also finding that the Ontario government violated the Act by entering into the 2000 and 2015 agreements. That is fatal to Mountain Crest's federal claims. *O.N.E. Shipping*, 830 F.2d 449 at 452–53 (dismissing antitrust claim under act of state doctrine

because the plaintiff's "allegations make clear that its antitrust suit is premised on contentions that it was harmed by acts and motivations of a foreign sovereign which the district court would be called on to examine and pass judgment on"); *Sea Breeze Salt*, 2016 WL 8648638, at *4–5 (dismissing antitrust claims under act of state doctrine because, "for Plaintiffs' antitrust claims to succeed, Plaintiffs must prove the participation of ESSA, a joint-venture majority controlled by the Mexican government, in a conspiracy to restrain trade"); *In re Fresh & Process Potatoes*, 834 F. Supp. 2d at 1180 (dismissing antitrust claims under act of state doctrine because "the Court would need to conclude that [Canadian government agencies] illegally agreed to reduce the supply and export of potatoes in their respective provinces").

Perhaps equally important, the court sees no way that it could remedy any alleged restraints on trade without enjoining the Ontario government. After all, it is the practices at *LCBO* stores, not BRI stores, that Mountain Crest is challenging. Thus, no injunction against defendants could provide Mountain Crest any immediate relief. In fact, defendants observed in their opening brief that relief in Mountain Crest's favor would require the cooperation of the Ontario government, but Mountain Crest did not discuss the issue in its opposition brief, suggesting that Mountain Crest concedes the point. That in itself is sufficient to defeat Mountain Crest's federal claims. *Spectrum Stores*, 632 F.3d at 955–56 (applying act of state doctrine because "granting of any relief to Appellants would effectively order foreign governments to dismantle their chosen means of exploiting the valuable natural resources within their sovereign territories"); *IAM*, 649 F.2d at 1361 (applying act of state doctrine because "the granting of any relief would in effect amount to an order from a domestic court instructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources").

### 3. *Hughes v. Liquor Control Board of Ontario*

This court's conclusion that the act of state doctrine applies is consistent with *Hughes*, 2018 ONSC 1723, a recent decision by the Ontario Superior Court of Justice. In that case, the court considered a challenge similar to the one raised by Mountain Crest in this case. The plaintiffs asserted that defendants' Canadian subsidiaries and the LCBO violated Canadian antitrust law when they agreed that the LCBO would not sell beer in packages greater than six containers. *Id.*, ¶ 7. The defendants said that their conduct was justified under the "regulated conduct" defense. *Id.*, ¶ 9. Under that defense, "conduct authorized by valid provincial or federal legislation is deemed to be in the public interest, and . . . such regulated conduct cannot constitute an 'undue' limit on competition contrary to the conspiracy provisions of the Competition Act." *Id.*, ¶ 221.

The Ontario court dismissed all of the plaintiffs' claims, concluding that "the Defendants were operating under a regulated provincial regime governing commerce in alcohol and that the 2000 Beer Framework Agreement was authorized conduct within the scope of the Regulated Conduct Defence." *Id.*, ¶ 197. The court rejected the plaintiffs' contentions that the defense did not apply because the Ontario government did not have authority to approve conduct that would otherwise violate antitrust law. *Id.*, ¶¶ 235 and 241.

*Hughes* is instructive for at least three reasons. First, it confirms the view that the actions challenged in this case are public acts taken by the Ontario government. Second, it shows that defendants' conduct is valid under the law of the land where the conduct occurred. *Sabbatino*, 376 U.S. at 415 n.17 (in determining that act of state doctrine applied, noting that "[i]t has not been seriously contended that the judicial institutions of [the foreign government] would declare the decree invalid"); *Riggs Nat. Corp. & Subsidiaries v. C.I.R.*, 163 F.3d 1363, 1368 (D.C.

16

Cir. 1999) (in determining that act of state doctrine applied, noting that the conduct in question had been upheld by foreign court where conduct occurred). Third, it shows that the Ontario government is unified in its approval of defendants' conduct: the executive, legislative, and judicial branches have each authorized that conduct.

A primary purpose of the act of state doctrine is to avoid unnecessary conflict with other countries. *Kirkpatrick*, 493 U.S. at 404 (doctrine "reflect[s] the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder the conduct of foreign affairs") (internal quotations omitted); *Sabbatino*, 376 U.S. at 417–18 ("To permit the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations.") (internal quotations omitted). Although the regulation of alcohol may not present the most sensitive of international issues, the reasons for deferring to the Ontario government in this case are many. Not only has the policy of the Ontario government been stated clearly by all three branches, but the current policy reflects a careful consideration and balancing of many competing factors over a period of "decades." *Hughes*, 2018 ONSC 1723, ¶ 115.

The court in *Hughes* emphasized that point:

> The regulation of alcohol has very significant public policy ramifications because it touches upon, among other things, public health and welfare, the environment (recycling), public safety, jobs and employment, and government finances. Complex, high-level decisions were made from time-to-time by senior Government officials or in some cases, through the enactment of legislation by the Legislative Assembly that directed the activities of the LCBO. The LCBO was expected to implement Government policy with regard to the distribution and sale of alcohol within the parameters set out by the Liquor Control Act and related legislation

*Id.*, ¶ 84. The court also noted that the particular rules being challenged had pragmatic justifications unrelated to any intent to suppress competition:

> Brewers Retail was established for the specific purpose of providing Ontario with an efficient and cost-effective channel through which large volumes and packages of beer could be distributed and sold across the province, which was not part of the LCBO's business. The LCBO focused on wine and spirits. The LCBO did not develop the infrastructure necessary to warehouse, distribute and sell beer on a scale necessary to service Ontario's retail and licencee consumers.

*Id.*, ¶ 92.

### 4. Conclusion

Regardless of the reason for the rules at issue, the important point is that the Ontario government chose to reaffirm them despite being aware of the objections like the ones Mountain Crest is raising. (Mountain Crest alleges in its second amended complaint that, after the details of the 2000 agreement became public in 2014, there was widespread criticism of the agreement in the press.) A ruling in Mountain Crest's favor would both declare the Ontario government's policy choices invalid *and* require the government to dismantle its policy.

Mountain Crest does not allege that it is a singular victim of BRI's agreement with the Ontario government. Rather, it says that all independent American brewers are being harmed. If the harm is as significant as Mountain Crest suggests, then the executive branch may choose to intervene. *Sabbatino*, 376 U.S. at 422–23 ("[T]he usual method for an individual to seek relief [for harm caused by an act of state] is to exhaust local remedies and then repair to the executive authorities of his own state to persuade them to champion his claim in diplomacy or before an international tribunal."). In fact, as noted in *Hughes*, that is exactly what the United States did previously when it concluded in the 1980s that Canada was discriminating against imported beer. 2018 ONSC 1723, ¶¶ 118–19 (discussing complaint brought under the General

Agreement on Tariffs and Trade). But the proper remedy is not a showdown between a United States federal court and a foreign government. That is exactly the type of conflict that the act of state doctrine is intended to avoid.

### 5. Mountain Crest's objections

Mountain Crest advances several reasons for rejecting the application of the act of state doctrine in this case, but none are persuasive.

#### a. Commercial activity

Mountain Crest says that the act of state doctrine does not apply to a "private" or "commercial" agreement, even if the government is a party to the agreement, and that the June 2000 agreement was "private" and "commercial." But both aspects of this contention are incorrect. The "private or commercial" exception that Mountain Crest cites comes from the Foreign Sovereign Immunity Act, not the act of state doctrine, *Saudi Arabia v. Nelson*, 507 U.S. 349, 359–60 (1993), so it has no application to this case.

To support the application of a "commercial activity" exception to the act of state doctrine, Mountain Crest cites *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682 (1976). That case was about the act of state doctrine, but the Court's holding was that the doctrine did not apply because the defendants failed to show that the conduct in question was authorized by the foreign government. *Id.* at 694–95. Unlike this case, there was "[n]o statute, decree, order, or resolution" from the foreign government. *Id.*

A minority of justices would have decided *Alfred Dunhill* on the alternate ground that the claim at issue was simply an attempt to collect a debt and "the concept of an act of state should not be extended to include the repudiation of a purely commercial obligation owed by a foreign sovereign or by one of its commercial instrumentalities." *Id.* at 695 (opinion of White,

J.). Lower courts have debated whether to follow this view. *Compare Honduras Aircraft Registry, Ltd. v. Honduras*, 129 F.3d 543, 550 (11th Cir.1997) ("[T]here is no commercial exception to the Act of State Doctrine as there is under the FSIA."), *and IAM*, 649 F.2d at 1360 ("The act of state doctrine is not diluted by the commercial activity exception which limits the doctrine of sovereign immunity."), *with Petersen Energia Inversora, S.A.U. v. Argentine Republic*, No. 15-cv-2739, 2016 WL 4735367, at *7 (S.D.N.Y. Sept. 9, 2016) ("The [act of state] doctrine does not, however, apply to the purely commercial conduct of a foreign sovereign."). Neither a majority of the Supreme Court nor the Court of Appeals for the Seventh Circuit has taken sides on this question. *E.g.*, *Kirkpatrick*, 493 U.S. at 404–05 (noting question but concluding that it was unnecessary to decide it).

But even if this court were to follow Justice White's view in *Alfred Dunhill*, it would make no difference. The public acts at issue in this case cannot be compared to the conduct in *Alfred Dunhill*, which was a simple failure to pay a debt. As the court noted in *Hughes*, the decisions at issue in this case involved policy choices regarding how Ontario wanted alcohol to be distributed and sold. 2018 ONSC 1723, ¶ 92. "The LCBO was never free to carry on business as if it were a private, profit-maximizing commercial enterprise free of government influence." *Id.*, ¶ 85. And the 2015 amendment to the Liquor Control Act states that the agreement relates to the "regulation and control of the sale of beer in Ontario." Liquor Control Act, R.S.O. 1990 c. L.18 § 10(3) (Can.).

Even the commercial activity exception under the FSIA does not extend to actions like those in this case in which the government is acting as a regulator. *Saudi Arabia*, 507 U.S. at 360 ("[Under the FSIA], a state engages in commercial activity . . . where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to

sovereigns"); *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) ("[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA."). Even if the government was motivated by commercial interests, that would not be enough to trigger the exception when it is acting as a sovereign. *Weltover*, 504 U.S. at 614.

Mountain Crest also says that there is a separate exception to the act of state doctrine for "private" activities and that the 2000 agreement was "private" because it was secret. But Mountain Crest cites no authority for this view. Even under the FSIA, courts interpret "private" and "commercial" as having a similar meaning: not acting in a sovereign capacity. *E.g.*, *Ministry of Def. & Support for Armed Forces of Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 984 F. Supp. 2d 1070, 1079–80 (S.D. Cal. 2013), *aff'd sub nom. Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Frym*, 814 F.3d 1053 (9th Cir. 2016). It has nothing to do with secrecy. In any event, it is undisputed that the 2015 agreement and the legislation authorizing the 2000 agreement were both "public" in the sense to which Mountain Crest is referring. So even if Mountain Crest's understanding of the term "private" were correct, it would make no difference to this case.

### b. Questioning the validity of a public act

Mountain Crest's second objection is that the court will not have to question the validity of the 2000 agreement or the 2015 amendment to Liquor Control Act in order to grant Mountain Crest relief. As to the 2000 agreement, Mountain Crest says that it is not controlling because defendants "continued their conspiracies to restrain the LCBO's ability to buy beer via package size limitations and price fixing arrangements even after the signing of the contract."

Dkt. 55, at 32. As to the amendment to the Liquor Control Act, Mountain Crest says that it "did not prescribe as law the contents of the June 2000 contract." *Id.* at 33.

Neither argument is persuasive. Mountain Crest does not explain how defendants "continued their conspiracies" after the 2000 agreement, but presumably Mountain Crest is referring to BRI's alleged refusal to renegotiate the terms of that agreement despite the LCBO's interest in doing so. Even if that is what happened, Mountain Crest fails to explain the significance of those events. Regardless of any conduct by defendants, the source of the harm is still the agreement with the government. *Gen. Aircraft Corp. v. Air Am., Inc.*, 482 F. Supp. 3, 6–7 (D.D.C. 1979) ("[W]here the injury complained of results directly from the acts or decisions of a foreign sovereign and only indirectly from defendants' allegedly unlawful anticompetitive activities, the Court must dismiss the claims [under act of state doctrine]."); *Hunt v. Mobil Oil Corp.*, 410 F. Supp. 10, 24 (S.D.N.Y. 1975) (act of state doctrine barred antitrust claim for "defendants' conspiratorial manipulative activities" because source of harm was still "acts and conduct of Libyan officials"), *aff'd*, 550 F.2d 68 (2d Cir. 1977). And the government chose to reaffirm that agreement in 2015 and went so far as to endorse it in legislation. Thus, any alleged conspiracy between defendants was approved and adopted by the government. Mountain Crest points to no conduct by defendants after 2015 that contributed to any additional harm.

Mountain Crest's argument about the 2015 legislation is puzzling. Mountain Crest says that the law did not "prescribe the contents" of the agreement but again fails to explain the significance of its observation. The amendment states that the LCBO was "directed" and BRI was "authorized" to enter into the agreement. Liquor Control Act, R.S.O. 1990 c. L.18 § 10(3) (Can.). Because the agreement was already in effect at the time of the legislation, there is no

reasonable reading of the provision other than as an approval of the contents of the agreement. If the agreement was unlawful, it follows that the government's approval of the agreement was unlawful as well. So a challenge to the agreement is also a challenge to the statute.

Mountain Crest does not deny that granting relief in its favor would require the court to invalidate the 2015 agreement. Instead, Mountain Crest says that agreement is not a public act because it is a "commercial contract," but the court has already rejected that argument.

### c. Motives of Ontario government

Mountain Crest also says that the language of the 2015 agreement shows that the Ontario government was concerned about being sued by defendants because the agreement includes promises from BRI not to sue the government. This is related to another argument by Mountain Crest that the act of state doctrine should not apply because "the LCBO never gave up trying to resist Defendants' market allocation conspiracies." Dkt. 55, at 27.

Yet again, Mountain Crest does not explain the relevance of these observations. The question under the act of state doctrine is whether "the foreign government has acted in a given way on the subject-matter of the litigation," *Sabbatino*, 376 U.S. at 418; "the details of such action or the merit of the result cannot be questioned but must be accepted by our courts as a rule for their decision." *Id.* In other words, "the act of state doctrine is applied without inquiry into motives." *Konowaloff v. Metro. Museum of Art*, No. 10 CIV. 9126 SAS, 2011 WL 4430856, at *8 (S.D.N.Y. Sept. 22, 2011), *aff'd*, 702 F.3d 140 (2d Cir. 2012). All that matters is that the government took the act in question; it does not matter why. *In re Vitamin C Antitrust Litigation*, 837 F.3d 175, 191 (2d Cir. 2016) (in determining that act of state doctrine applies, "[w]hether Defendants had a hand in the [foreign] government's decision to mandate some level of price–fixing is irrelevant"; the court will "decline to analyze why [the foreign

government] regulated [a market] in the manner it did and instead focus on what [foreign] law required"). *See also Am. Banana Co. v. United Fruit Co.,* 213 U.S. 347, 358 (1909) ("[P]ersuading a sovereign power to do this or that cannot be a tort [because] it is a contradiction in terms to say that, within its jurisdiction, it is unlawful to persuade a sovereign power to b[r]ing about a result that it declares by its conduct to be desirable and proper. . . . The very meaning of sovereignty is that the decree of the sovereign makes law."). In this case, the agreements at issue were approved by the minister responsible for supervising the LCBO, the Ontario legislature, the Ontario government, and now an Ontario court. That is sufficient for applying the act of state doctrine, regardless whether the LCBO may have originally objected to the agreement.

### d. Other arguments

Finally, Mountain Crest makes a series of conclusory arguments that do not require extended discussion: (1) the act of state doctrine should not apply because it was possible before entering into the 2000 and 2015 agreements for defendants to comply with both Canadian and U.S. law; (2) the doctrine is not jurisdictional; and (3) the doctrine should not be applied in the context of a motion to dismiss. In support of the first argument, Mountain Crest cites *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 797 (1993). But that case is about the doctrine of international comity, not the act of state doctrine, which on its face does not require a private defendant to show that it was compelled to act a certain way.

As to the second argument, it is true that the act of state doctrine is not jurisdictional, but that means only that the court is not required to raise the issue on its own. Because defendants have raised a defense under the doctrine, it is simply irrelevant for the purpose of defendants' motion whether the doctrine is jurisdictional.

24

As to the third argument, Mountain Crest cites no authority for the view that a court may not apply the act of state doctrine in the context of a motion to dismiss for failure to state a claim. As with any other issue, it is appropriate to dismiss a claim on act of state grounds when it is clear from the face of the complaint that the doctrine applies. *Parungao v. Cmty. Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017). That is what the court has concluded in this case. As defendants note, other courts have held in the context of a motion under Rule 12(b)(6) that a claim should be dismissed under the act of state doctrine. *Knowaloff v. Metro. Museum of Art*, 702 F.3d 140 (2d Cir. 2012); *Spectrum Stores*, 632 F.3d at 956; *In re Refined Petroleum Prods. Antitrust Litig.*, 649 F. Supp. 2d 572 (S.D. Tex. 2009); *Glen v. Club Mediterranee S.A.*, 365 F. Supp. 2d 1263 (S.D. Fla. 2005), *aff'd*, 450 F.3d 1251 (11th Cir. 2006); *Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073 (C.D. Cal. 1999).

The bottom line is that the allegations in Mountain Crest's second amended complaint fall within the scope of the act of state doctrine as it has been defined by the Supreme Court and Mountain Crest has not identified a persuasive reason for declining to apply the doctrine in this case. The court will grant defendants' motion to dismiss Mountain Crest's claims under the Sherman Act.

## C. State law claims

Mountain Crest relies on 28 U.S.C. § 1367 as the basis for exercising jurisdiction over its state law claim for unjust enrichment. Dkt. 49, ¶ 10. In their motion to dismiss, defendants ask the court to decline to exercise supplemental jurisdiction over the state law claims in accordance with § 1367(c)(3), which stands for the general rule that courts should dismiss state law claims when the court dismisses all the federal claims in the case before trial. *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015). Because Mountain Crest does not object to

defendants' request or otherwise respond to this argument, the court will dismiss Mountain Crest's state law claims without prejudice to its refiling them in state court.

ORDER

IT IS ORDERED that the motion to dismiss filed by defendants Anheuser-Busch InBev SA/NV and Molson Coors Brewing Company, Dkt. 50, is GRANTED as to plaintiff Mountain Crest SRL, LLC's federal claims. In accordance with 28 U.S.C. § 1367(c)(3), the court declines to exercise supplemental jurisdiction over Mountain Crest's state law claims and those claims are DISMISSED without prejudice to Mountain Crest refiling them in state court.

Entered May 16, 2018.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge